FILED
BILLINGS DIV.

2011 SEP 30 PM 3 45

RICK E. DUFFY, CLERK
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Cause No. CR 04-087-BLG-RFC<br>CV 09-103-BLG-RFC |
| Plaintiff/Respondent, | |
| vs. | ORDER DENYING CLAIMS 1 & 2 |
| MARTIN GARCIA, | |
| Defendant/Movant. | |

Defendant/Movant Martin Garcia is serving a 60-year sentence for drug trafficking, money laundering, and firearms offenses. Am. Judgment (doc. 597) at 2-3. On August 14, 2009, represented by new counsel Wendy Holton, *see* Resentencing Tr. (doc. 622) at 21:10-22:7, Garcia filed a motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255.

Garcia's first claim asserts that trial counsel Glenn Carpenter violated his Sixth Amendment right to the effective assistance of counsel at trial by failing to bring to the jury's or the Court's attention the limited use immunity granted to witness

1

Gwynne Black (Claim 1A) and the discrepancies among Black's testimony before the grand jury, her debriefing with case agents, and her trial testimony (Claim 1B). He makes similar allegations regarding discrepancies in the testimony of Patricia Prem, Black's mother (Claim 1C). *Strickland v. Washington*, 466 U.S. 668 (1984). In his second claim, Garcia asserts that the United States violated his right to due process by failing to alert the Court to these discrepancies (Claim 2). *Napue v. Illinois*, 360 U.S. 264 (1959). Following discovery on these two claims, the matter was fully briefed on the merits on June 2, 2011.

Garcia requests an evidentiary hearing, Garcia Br. (doc. 737) at 21-22, but he does not explain what he would do at a hearing, and he does not identify a meaningful conflict in the evidence the parties have submitted. A hearing is not necessary.

## Background

Garcia was named in a 25-count indictment along with Black, her sometime-boyfriend Eddie Santiago, Robert Green, and ten other co-conspirators. Garcia and Green went to trial. Black, Santiago, and the other defendants pled guilty. Garcia charted the course for the defense at trial:

Q.  And your theory of the case was that the Government's witnesses were falsely pointing the finger at Martin Garcia?

A.  Yeah, that's part of it.

2

Q. What is the other part?

A. The main part is that I had been in a trial earlier that year here in Seattle where an Alex Delgadillo was one of the – the star was one of the main suppliers. I didn't represent him. I represented a co-defendant in that trial, and he was from Mount Vernon. Mr. Garcia, you know, wanted to win the trial. He didn't want to take a deal. He didn't want to minimize his sentence. In other words, he didn't want to say, I'm guilty of the drugs but not the guns. He wanted to win the trial. That was my instructions from him. The only way to do that is I had to blame someone else and give them a motive for these witnesses to blame someone. So some of the statements – and Alex came up from Mount Vernon that supplied meth. So I knew there had been a drug dealer in Mount Vernon named Alex Delgadillo. . . . The motivation was fear of him to blame someone else to show, as much as we could that Mr. Garcia had a legitimate business and to attack their memories because they all had used drugs for several years, different kinds of drugs and the effects drugs had on their memory, okay. So all of this was a theory, and that's what we tried to do.

Carpenter Dep. (doc. 739) at 6:18-7:12.

"Alex," in fact, appeared in the FBI 302's disclosed to counsel before trial. Santiago and Black said that "Alex" supplied Santiago and Green when they were unsuccessfully attempting to sell methamphetamine in Montana in the spring of 2003. *E.g.*, Answer (doc. 683) Ex. I at 2-4; 2 Trial Tr. at 327:18-329:3, 332:20-333:11. Santiago also reported that Garcia said he too was supplied by "Alex," but when Santiago threatened him with a gun, Garcia then said "Alex" was not the supplier. Answer Ex. I at 10-11. At least some of Santiago's statements were questionable; for

3

instance, as Carpenter would have known, there was no "hidden room" in Garcia's house, though there was a small hidden compartment "next or behind" a cast iron stove. *Compare* Answer Ex. I at 11 *with* 3 Trial Tr. at 688:4-18. Alex Delgadillo was arrested in June of 2004, after the conclusion of the conspiracy in this case and in the same month Garcia was arrested. Before Garcia's trial, Delgadillo pled guilty to drug trafficking in the Mount Vernon area of Washington, where Garcia also lived. 3 Trial Tr. at 689:18-690:4.

Black, Santiago, five other co-defendants, and several other co-conspirators, who either were not indicted or were charged in separate indictments, were expected to testify at trial. Of all the trial witnesses, only Santiago, Black, and Leota Beartusk claimed to have personal dealings with Garcia. Of these three, Santiago had the most incriminating information. *Compare* Answer Exs. I-K (Santiago 302's) *with* Answer Exs. E, G-H (Black 302's) *and* 3 Trial Tr. at 580:14-629:22 (L. Beartusk).

Black testified on the second day of trial, August 9, 2005. Santiago was called on the third day. When he took the stand, he said:

I didn't agree to cooperate in my plea agreement. I will not sit here and convict anybody who is innocent in this case. I am off the stand. Shit shit shit shit.

3 Trial Tr. at 529:25-530:2. The jury was instructed to disregard his remarks. *Id.* at 546:20-24. Santiago's refusal to testify placed a significantly heavier burden on

4

Black's and Beartusk's testimony.

Garcia now alleges that counsel should have undermined Black's credibility by showing the jury that she received immunity and by highlighting several inconsistencies among her grand jury testimony, her debriefing, and her trial testimony. He argues that discrediting Black in these ways would have supported his claim that he was being blamed to protect "Alex," Black's and Santiago's true source.

Garcia's Claims 1B and 2 particularly involve the following questions and answers in Black's direct examination by the United States, addressing her inducements to testify against Garcia:

Q. You were not charged federally?

A. No.

Q. You were only charged in the state court system?

A. Yes.

Q. Have *any* promises been made to you or your mother *at all* by the United States?

A. Not that I can recall.

Q. Nothing further.

Trial Tr. at 317:10-17 (emphasis added).

In fact, both Black and the prosecutor who asked these questions personally

5

signed two letters, one on October 14 and one on October 16, 2003, memorializing

and acknowledging that Black gave testimony and information with the

understanding that she would not be prosecuted. The letters said:

Gwynn Hailey Black

Re: USE IMMUNITY

Dear Ms. Black:

Please be advised with respect to your debriefing in Billings, Montana, on October 14, 2003, and succeeding days, that the United States does not intend to prosecute you based on Title 21 U.S.C. violations which may be revealed and upon which prosecution could be based as a result of your debriefing.

You should, however, be cautioned that this policy does not extend to any violations of the perjury statutes which are found in 18, United States Code, Sections 1621 and 1623, or to false statements made pursuant to 18, United States Code, Section 1001, or to any crimes of violence.

Answer Ex. D at 1 (dated Oct. 14, 2003); Answer Ex. F at 1 (dated Oct. 16, 2003).

Black was also told she had use immunity for her grand jury testimony, which she

gave on October 15, 2003. Answer Ex. E at 4:5-14.

Near the close of trial, while instructions were being settled, the subject of

immunity came up. The record was not set straight. At most, the United States

suggested that unidentified witnesses received use immunity for statements made

before the grand jury. 3 Trial Tr. at 702:5-703:16.

6

## Analysis

Claims of ineffective assistance are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Garcia must show both that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "[T]here is no reason . . . to address both components of the inquiry if the [movant/defendant] makes an insufficient showing on one." *Id.* at 697.

The government may not use evidence it knows to be false to obtain a criminal conviction. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "In addition, the state violates a criminal defendant's right to due process of law when, although not soliciting false evidence, it allows false evidence to go uncorrected when it appears." *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc) (citing *Alcorta v. Texas*, 355 U.S. 28 (1957), and *Pyle v. Kansas*, 317 U.S. 213 (1942)).

The standard for showing prejudice on a *Strickland* claim is the same as the standard for showing the materiality of a *Napue* due process violation. Both are derived from *United States v. Agurs*, 427 U.S. 97, 104 (1976) (reviewing claim of error under *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). *See Strickland*, 466 U.S. at 694 (citing *Agurs*); *Hayes*, 399 F.3d at 984-85 (discussing *Agurs* and *Strickland*).

7

*Strickland* defines this standard as "a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. As the Court explained, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* (emphasis added). "[T]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hayes*, 399 F.3d at 984 (quoting *Hall v. Director of Corrections*, 343 F.3d 976, 983-84 (9th Cir. 2003) (per curiam) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).[1] Thus, for the claims at issue here, the prejudice/materiality standard is *less* than a preponderance of the evidence.

Because the United States, in its briefing, does not come to the point of admitting that Black's immunity was a fully enforceable promise, I will start with what I believe is the correct immunity analysis.

Black was subpoenaed as a federal grand jury witness a short while after her arrest in October 2003. She did not await the moment when she was called to the

---

[1] The en banc court in *Hayes* unanimously found a due process violation but divided on the standard for showing its materiality. The majority's test is applied here, without regard to *Fry v. Pliler*, 551 U.S. 112 (2007), which probably does not apply anyway, *Hayes*, 399 F.3d at 985. If Garcia cannot meet the *Hayes* test, he cannot meet the *Fry* test.

stand to decide whether to assert her Fifth Amendment privilege against self-incrimination, so she was not formally compelled to testify. Instead, advised by counsel, she reached an agreement with the prosecution that was memorialized in the first of the two letters at issue here, dated October 14, 2003, Answer Ex. D. She testified before the grand jury on October 15, 2003, Answer Ex. E. On October 16, 2003, she received the second letter, Answer Ex. F, and she was debriefed by case agents the next day, Answer Ex. G.

Because Black did not assert her Fifth Amendment privilege and was not compelled to testify, her agreement falls in the category of "informal immunity." *United States v. Plummer*, 941 F.2d 799, 802 (9th Cir. 1991). The prosecution "can grant the defendant varying degrees of immunity in an informal agreement." *United States v. Dudden*, 65 F.3d 1461, 1467 (9th Cir. 1995). An informal agreement confers both use and derivative-use immunity unless it says otherwise. *Id.* Informal agreements, like the letters of October 2003, are interpreted "using ordinary contract principles." *Id.* "The language of the contract is to be read as a whole and given a reasonable interpretation, not an interpretation that would produce absurd results." *United States v. Irvine*, 756 F.2d 708, 710 (9th Cir. 1985) (per curiam) (internal citations omitted).

It would be absurd to suggest that Black's immunity letters did not induce her

to forego her right to assert her Fifth Amendment privilege against self-incrimination.
It would be absurd to interpret the letters as leaving any power in the United States
to use against Black in a future proceeding under Title 21 her grand jury testimony,
or her statements in her debriefing, or anything learned as a result of her testimony
or debriefing. *Dudden*, 65 F.3d at 1468 (holding that identical language in a letter
signed by the same prosecutor extended immunity to defendant against subsequent
prosecution and remanding for hearing to determine "whether the government
breached the immunity agreement" by using defendant's statements against her, either
directly or derivatively). Black's immunity agreement with the United States, as
evidenced by the letters, was a fully enforceable promise.

Therefore, when the prosecutor said, "Have *any* promises been made to you or
your mother[2] *at all* by the United States?," he left a false impression with the jury –
and with me, since I had no idea Gwynne Black received any immunity, much less
use and derivative-use immunity, 3 Trial Tr. at 702:5-703:16 – when he failed to
remind Black of his agreement with her. A prosecutor has a due process obligation
not to use evidence he knows to be false in fact, even if the *witness* who gives it *is not
even aware* it is false. The Constitution imposes "an affirmative duty on the part of

---

[2] In its merits brief, the United States says, "How would Gwynne Black know what was
promised to her mother, if it was." United States Br. (doc. 735) at 19. It asked the question. It also
points out that Black was not given transactional immunity. *Id.* at 18-19. True and irrelevant.

10

the prosecution to correct false testimony at trial." *Hayes*, 399 F.3d at 981; *id.* at 988-89 (en banc court unanimously rejecting claim that, because witness was "ignorant" of the prosecution's secret promise to witness's counsel to dismiss other pending felony charges after witness testified, the witness "did not commit perjury and the State did not run afoul of *Napue*.").[3] If a witness's total ignorance is not enough to exempt a prosecutor from correcting the record, there is little point in quibbling over a temporary lapse of memory – as the prosecutor recognized when he corrected Black's statement that she gave "full answers" and "full details" in her grand jury testimony, *see* 2 Trial Tr. at 303:23-304:9.

The question, therefore, is whether the prosecutor's misrepresentation was material, that is, whether it deprived Garcia of "a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hayes*, 399 F.3d at 984.

Black testified that she met Garcia through her friend, Mariah Munter, and shared drugs with Munter that she understood to come from Garcia. Black also said

---

[3] Neither Black nor James, the witness in *Hayes*, gave an answer like that of the flat-out lying witness in *Napue*: "There ain't nobody promised me anything." 360 U.S. at 267 n.2. But Black's answer, like James's, suggested something known to be false in fact, even if Black and James believed they stated the truth, the whole truth, and nothing but the truth. In fact, as *Hayes* points out, false-in-fact testimony of this nature can be even more damning, because it is delivered with real conviction and sincerity. *See* 399 F.3d at 981. And even if Black, in the moment, forgot her immunity (a possibility at least as questionable as the *Hayes* court suggested of James, *id.* at 981 n.1, 987), that would not purge her testimony of self-serving taint. She testified and debriefed on previous occasions, and she reviewed that material before trial. 2 Trial Tr. at 303:23-25.

Garcia gave her an ounce of cocaine on each of two occasions to take to Montana to sell when Black was visiting Santiago, who was traveling to Montana to try to sell methamphetamine he received from "Alex." *See generally* 2 Trial Tr. at 255:4-261:4. This testimony was uncorroborated, but Garcia wanted the jury to accept that Black knew "Alex."

According to Black, at the beginning of August 2003, Santiago's friend Colleen Abrahams went to Washington to pick up Black and bring her back to Billings. Black stayed with Abrahams and her boyfriend James Cooper from August until October, "[o]ff and on," sometimes with Santiago. 2 Trial Tr. at 262:16-263:15. Black knew Santiago "had lost a big amount of drugs somewhere," *id.* at 263:21-22, so she called Garcia and asked if he could get her an ounce of crystal methamphetamine. Garcia said she would have to take a pound instead of an ounce, but ultimately he fronted her a half-pound. *Id.* at 264:6-265:21. Garcia delivered the half-pound to Billings hidden inside a tire. When it was discovered to be crank instead of crystal, he and Santiago went to Coeur d'Alene or Missoula to exchange it for crystal. When they returned, Garcia accepted $2,000 payment out of a total of $8,000 expected, told Black "that was [her] ass" if the amount owing was not paid, and went back to Washington. Black and Santiago sold it, realizing $12,000 to $15,000. *Id.* at 265:20-271:5. They took Garcia's $6,000 to Washington and

12

"personally handed the money over to Martin." *Id.* at 272:6-7.

Black and Santiago sold another half-pound of meth, made one or two trips with "Nate," one trip in which they carried the methamphetamine in a raisin container, and one trip to a rendezvous in Missoula with "Chris," an employee in Garcia's shop, from whom Black and Santiago picked up meth and a gun. 2 Trial Tr. at 274:24-277:4, 284:18-285:23. On one occasion, Garcia came to Billings with his wife and stayed at the local Howard Johnson's. *Id.* at 282:5-283:5. In another trip, Black's mother, Prem, unbeknownst to her, brought methamphetamine to Billings concealed in her vehicle. Payment for it was concealed and sent back to Washington in the same vehicle. *Id.* at 288:23-292:10.

The "external" details of these transactions, as described by Black, were extensively corroborated. For example, Zindler and Miller both testified they knew Santiago had meth in a raisin container, *id.* at 419:24-420:12, 442:3-13, and Miller also saw the ripped-open tire, *id.* at 446:1-11. As Garcia now argues, this sort of testimony made it impossible to claim that nothing happened, but it did not corroborate his involvement in the conspiracy.

Six witnesses corroborated Black's testimony in limited respects that tended to incriminate Garcia. Prem testified that she took her car to Garcia's shop before and after she drove it to Billings. 2 Trial Tr. at 364:3-365:7. Colleen Abrahams testified

13

that she saw Garcia in Billings three times. The first time, he brought into her house a pound of meth hidden inside a tire. Someone told her the meth was "cooked wrong," and she said Garcia and Santiago left and returned. *Id.* at 337:20-339:21. The second time, she did not see any connection between Garcia and methamphetamine. The third time, she knew – she did not say how – that he brought two pounds of methamphetamine with him. She identified him in court. *Id.* at 339:22-342:16. She also testified that, under the influence of methamphetamine, she was susceptible to suggestion and sometimes saw things that were not there, *id.* at 349:8-350:5, and she described "Shannon" as a "short Indian gal," *id.* at 346:8-9, whereas Black said Shannon was male, *id.* at 295:22-296:2.

James Cooper testified he was told Garcia was responsible for the meth in the tire.[4] He also said he had previously told police Garcia brought two pounds of meth to Billings on another occasion, 2 Trial Tr. at 381:20-383:12, though he conceded this

---

[4] Several witnesses did not explain how they knew what they testified to. Fed. R. Evid. 602. Of all the witnesses, only Black and Beartusk claimed personal knowledge that Garcia was the supplier. Cooper, Zindler, and Lavenger named Garcia as the supplier, but only in statements that would be hearsay but for Fed. R. Evid. 801(d)(2)(E), and with no showing that the statements they reported were made in furtherance of the conspiracy. It is troubling that the prosecutor said, "It doesn't necessarily have to be in furtherance of the conspiracy." 2 Trial Tr. at 482:21-22. It does. *Id.* at 482:24-483:1; Fed. R. Evid. 801(d)(2)(E). But no objection was made at trial to the statements described in the text here, nor was the hearsay matter raised as an instance of ineffective assistance in the § 2255 motion, or even in the merits briefs. Presumably, therefore, the circumstances disclosed by discovery made it clear that the testimony was admissible, and defense counsel reasonably decided not to call attention to the circumstances.

information was not based on his personal knowledge, *id.* at 398:23-25. Erin Zindler said Black and Santiago told her they got the meth from Martin Garcia. *Id.* at 411:19-25. James Lavenger said Santiago said he got his meth from Garcia. *Id.* at 476:4-10. Lavenger also said he used meth at Garcia's house in Washington, *id.* at 491:15-492:1, but he could not identify Garcia when he saw him, *id.* at 494:8-495:9. Nate Miller met Garcia in Mount Vernon when he went with Santiago and Black to Washington, heard him say something to Santiago about phones being tapped, and later saw Garcia talking quietly with Santiago in Billings. *Id.* at 434:4-439:16.

Leota Beartusk provided testimony wholly independent from Black's. Beartusk said that, after Black and Santiago were arrested, Santiago asked her to continue the business by collecting the money he was owed. He gave her a toll-free phone number for Garcia's automotive shop. Beartusk said that, when she called Garcia from her home, Garcia told her to use a pay phone instead, to avoid wiretaps. She did. They arranged for Green to travel to Washington to pick up more methamphetamine. 3 Trial Tr. at 592:14-596:12, 613:4-18. Santiago repeatedly called Beartusk collect from the jail, and Beartusk said she arranged conference calls in which Garcia, Santiago, and Green participated. *Id.* at 601:12-602:18. Although the prosecution played some recorded phone calls for the jury, none of them included Garcia, *see* 4 Trial Tr. at 865:5-10, 872:1-9, but a police witness testified he heard

15

Garcia on the line, 3 Trial Tr. at 576:11-17. The United States introduced a slip of paper taken from Beartusk's home with Garcia's phone number on it in Beartusk's writing, and Beartusk identified Garcia at trial. *Id.* at 613:4-18, 616:19-617:5. Beartusk's testimony was not conclusive. She did not say how she knew the person she talked to on the phone was Garcia; she met him only once and talked to him "[j]ust not even a second," because Black did not want anyone to know him. *Id.* at 593:4-594:5.[5] Santiago told Beartusk[6] that Garcia was "his uncle" and "his dude," which she took to mean "his supplier, I guess." *Id.* at 594:9-14. But her testimony, like Black's, fits with others' testimony. Additionally, as with the witnesses who said Black and Santiago told them Garcia was the supplier, defense counsel did not point out that Beartusk did not say how she knew she talked to Garcia, and the § 2255 motion does not assert a claim on that basis either. *See supra* note 4.

When Garcia was arrested in Washington, he had copies of Santiago's "court papers," 3 Trial Tr. at 678:24-680:3, and a small bindle that appeared to be methamphetamine in his wallet, *id.* at 687:5-25, though it was too small a quantity to

---

[5] The jury was instructed to consider "the opportunity and ability of the witness to see or hear or know the things testified to[.]" 4 Trial Tr. at 804:22-23.

[6] Garcia's Presentence Report, at ¶¶ 76-77, states that he told Beartusk "Alex" was his supplier. The description of the statement in the report suggests that Garcia's statement was made in furtherance of the conspiracy, but Beartusk was not asked to testify to the statement at trial. Had she done so, Garcia's "Alex" theory would have been seriously undermined. I do not know whether that means Garcia named "Alex" to Beartusk or not. I assume not.

16

test. Garcia asked the arresting agent, "What's this all about?" The agent told him he was charged in Montana with trafficking in methamphetamine. Garcia responded that he had never been to Montana. *Id.* at 686:2-14. As set forth above, several witnesses testified to seeing him in Billings, and hotel receipts showed that he was in Billings, 2 Trial Tr. at 225:5-228:8.

As to the firearms counts under 18 U.S.C. § 924(c), Black testified that one of the guns seized from the room at the Red Roof Inn was the one Garcia sent to the rendezvous point in Missoula. 2 Trial Tr. at 309:5-11. She did not say that in her grand jury testimony, *see* Answer Ex. E at 37:24-38:17,[7] but in her debriefing on October 17, she said Garcia sent the firearm to Missoula with a go-between, "Chris." These core facts of her testimony were corroborated by others who accompanied her and Santiago to Missoula. Pennington said they picked up meth and two guns, and he later saw the guns at Cooper's house, *id.* at 459:24-460:10, where Santiago sometimes stayed. Lavenger said one gun was picked up along with the meth delivery, and Santiago took charge of the gun. *Id.* at 478:12-479:8. Zindler, too,

---

[7] A previous order mistakenly stated that Black incriminated Garcia before the grand jury. *See* Scheduling Order (doc. 702) at 2; Answer Ex. E at 27:24-28:16. She did not. Asked whether Garcia was involved in the drug conspiracy, she said only, "I don't have any [information] that I can pinpoint, but I started to put together pieces that there might be some involvement." Answer Ex. E at 28:13-16. She directly incriminated Garcia in her debriefing with case agents. Regarding firearms, she told the grand jury that she "found a black gun under the bed" at the Red Roof Inn and that Santiago got the other one from Lavenger, who got it from Kevin Parker, Answer Ex. E at 38:5-17, but she did not connect Garcia with the guns.

17

testified that Santiago had at least two guns, *id.* at 413:4-11, and she saw them at Cooper's house when Black was present also, *id.* at 423:25-424:2.[8]

As to drug quantity, the fact that the conspiracy was responsible for far more than 500 grams of a substance containing methamphetamine, 21 U.S.C. § 841(b)(1)(A)(viii), was established beyond all possible doubt. For instance, a photograph admitted at trial showed a large quantity of drug money laid out on a bed. Black said on one occasion it was $20,000, on another, $50,000. Even if it was $20,000, the photograph alone proved half the threshold amount for the entire conspiracy, because Black and Santiago charged $1,200 to $2,000 per ounce. *E.g.*, 2 Trial Tr. at 271:19-25. Like much of her other testimony, this aspect of Black's testimony was corroborated. 2 Trial Tr. at 410:6-8 (Zindler re: the picture), 432:12-433:21 (Miller re: price), 457:11-19 (Pennington re: price).[9]

In light of the multiple ways in which pieces of the evidence matched up, I

---

[8] A firearm was found in the search of Garcia's home. 3 Trial Tr. at 682:5-18.

[9] Garcia's argument in his § 2255 motion, like his trial strategy, is all or nothing; he says not that Black was mistaken in some respects but that she fabricated his involvement from the ground up. Neither Garcia's § 2255 motion nor his direct appeal, challenged or analyzed, on a count-by-count basis, the sufficiency of the evidence to support the jury's verdicts as to drug quantities. So I will not do the count-specific analysis either. Even assuming the proof did not meet the threshold amounts under 21 U.S.C. § 841(b)(1) as to one or more counts, Garcia received the due process protections required by *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), and *United States v. Buckland*, 289 F.3d 558, 566 (9th Cir. 2002) (en banc). If there is an error in some counts, it is not plain.

18

draw two conclusions.

First, Garcia was not prejudiced by counsel's failure to demonstrate to the jury each of the inconsistencies in Black's testimony. *See* Garcia Br. (doc. 737) at 5-7. It is not uncommon for witnesses to prevaricate on number of trips, quantity of drugs, and such details as in which direction who followed whom because the speedometer did not work. These discrepancies are easily understood as unremarkable tricks of memory, not outright lies. Black's testimony was corroborated in key respects establishing Garcia's guilt beyond a reasonable doubt on the counts of conviction. There is not even a reasonable probability – undemanding as that standard is – that Garcia would have been acquitted altogether, *supra* note 9, if counsel had demonstrated Black's inconsistencies for the jury. Claim 1B is denied for lack of prejudice.

Second, when I add to the foregoing facts (1) the United States' promise that it would not use Black's information or grand jury testimony against her in a future prosecution for drug offenses, and (2) the United States' own failure to bring its promise to the jury's attention, my confidence in the verdict is not altered one little bit. *Hayes*, 399 F.3d at 984. Certainly, trial counsel could have made the prosecutor look foolish if the first question he asked of Black on cross-examination revealed the prosecutor's *personal promise* not to use Black's debriefing against her. But the

19

prosecution did not depend on the prosecutor's credibility. It depended on Black and Beartusk and all the other evidence and witnesses who corroborated them. The evidence, Black's role in the trial, and the magnitude of the prosecutor's due process violation are not fairly comparable to *Hayes*. *See* 399 F.3d at 985-88 (James was the only witness who testified to Hayes's confession of killing and to burglarious intent to support felony murder, and State's secret deal with him "demonstrated that the State was going to great lengths to give James a powerful incentive to testify favorably, to the point of letting him go free on unrelated felony charges.").

Nor did Garcia receive ineffective assistance as a result of trial counsel's failure to show the jury Black's immunity letters or refer to her agreement.[10] It is possible that trial counsel should have been but was not aware of the agreement. *See* 2 Trial Tr. at 347:18-23 (asking Abrahams about an immunity letter, though she received none). Nonetheless, counsel's deposition shows that he made a strategic decision not to use it and would have made the same decision in retrospect. *E.g.*, Carpenter Dep. at 40:12-18, 45:13-18. He passed up a rare opportunity to "impeach" the prosecutor, but he could not have shown the jury the prosecutor's signature without also showing it the warnings against perjury and false statements.

---

[10] Of course, had counsel only elicited testimony about immunity, the prosecution could have introduced the letters on redirect.

I reject the United States' dramatic contention that defense counsel would have proved Black was afraid of Garcia and thereby created a "firestorm . . . !" for his client, United States Br. at 18, if counsel had shown that Black's grand jury testimony minimized Garcia's role. After all, she directly and extensively incriminated Garcia just two days later. And, as Garcia points out, counsel could fairly easily have incorporated Black's and Prem's alleged fear into fear of prosecution and/or fear of "Alex." In other words, the jury would believe Black and Prem were afraid of Garcia only if it believed he was the major drug supplier they said he was; there was no objective evidence that, if they were afraid, they were afraid of *him*.

But the perjury exception to Black's immunity agreement was a real problem for Garcia's counsel. Given the number of co-conspirators who testified they were told that Garcia was the supplier, arguing that Black incriminated Garcia in lieu of "Alex" would require the jury to believe that Black and Santiago planned from the beginning to "set up" Garcia. That, in turn, would pose a question about why Black told the grand jury she only "pieced together" some information that Garcia might be involved. Why would she *not* blame the fully-framed fall guy before the grand jury? Incrimination was the whole point of planting Garcia's name with the co-conspirators.

By contrast, the timing of the two immunity letters coincided with Black's

21

initial minimization of Garcia's involvement and her subsequent incrimination of
him. The inference that Black came to a deeper appreciation of what perjury is, and
possibly of her vulnerability to punishment by the State as well, in the two-day
interlude between her grand jury testimony and her debriefing, is virtually irresistible.
That is what defense counsel would have had to avoid, had he brought the letters to
the jury's attention. Instead of doing that, he did this:

Q. And did you plead guilty in state court?

A. Yes.

. . .

Q. But you didn't receive any jail time for that, did you?

A. Yes. I was in jail for a month.

Q. Well, time served, you received, basically?

A. Yeah.

Q. You didn't get any additional jail time?

A. No.

Q. And you were never charged federally with any of these crimes?

A. No.

Q. Did a lawyer ever explain to you what you could have faced if
you had been charged federally?

A.    Yes.

Q.    What did he tell you?

Mr. Seykora:    Objection, Your Honor, it's irrelevant.

The Court:  No, that's overruled.

. . .

A.    That I could possibly be charged as an adult because I was so close to turning 18, and that I could be looking at 25 years or more.

Q.    Or more?

A.    (No response.)

Q.    Twenty-five years or more, they told you?

A.    Yeah.

Q.    And if someone is 18, 25 years seemed like a long time to you?

A.    Yeah.

Q.    And you don't want to do 25 years in jail, do you?

A.    No.

Q.    So would it be fair to say you're receiving a benefit for testifying today?

A.    Yes.

Q.    A rather large benefit, wouldn't you say?

A. Sure.

Q. Twenty-five years. You're, what, 19 right now?

A. Yes.

2 Trial Tr. at 324:14-326:16; *see also id.* at 321:15-322:3 (Black states she has not

been tested for illegal drug use although she is on probation for drug crime).

And defense counsel also said:

Q. And didn't you say, in April of 2003, that Mr. Green made arrangements to buy meth from an Alex?

A. Yes.

. . .

Q. And that this Alex was a source of the meth that was going to be brought to Billings in April of 2003?

A. Yes.

Q. And you said Alex is a Hispanic man in his 30s, correct?

A. Yes.

Q. Do you know Alex's last name?

A. No.

Q. In fact, you said that Alex also supplied meth that was brought to Billings in May of '03, correct?

A. Yes.

Q. But you don't know Alex's last name?

A. No.

Q. In fact, you didn't give any other information to the FBI about Alex, did you?

A. No. I had only been in his presence once or twice, maybe, and only knew his name from hearing it in the house.

Q. Now this was a lot of meth that was being sent here to Billings, correct?

A. Yes.

Q. You wouldn't want Alex mad at you, would you?

A. I don't, I don't even personally know him.

Q. You wouldn't want Alex to take any, let's say, action against you, would you?

A. No.

Q. And so after May, you said, I believe you said in August, you approached Mr. Garcia for meth; is that correct?

A. Yes.

*Id.* at 327:22-329:3.

In short, Carpenter separated his questions about the self-serving motives behind Black's testimony from his theory about Alex. The jury heard both, but not together. That strategic decision was plainly reasonable. It prevented the jury from

drawing unfavorable inferences about why Black did not incriminate Garcia before the grand jury, and it gave him two arguments to make without dwelling on how they interrelated. A defense lawyer is speaking, after all, to twelve different people on a jury. All he needs is one, but he can't predict what will strike the resounding chord with any one juror, and he also can't say everything. To prove that Black legally could *only* be prosecuted for perjury would have made it harder to argue that she was lying about Garcia to protect "Alex." Because counsel's performance was reasonable, Claim 1A is denied.

At the same time, because the jury knew about "Alex" and also knew that Black felt she personally benefitted from testifying against Garcia, the evidentiary picture presented to it was not materially distorted by the prosecution's failure to correct the record regarding Black's immunity. For that reason, and in light of all the other evidence in the case, I conclude that Garcia's trial, though not perfect, was fair. Claim 2 is denied.

Claim 1C, regarding Prem's testimony, involves another witness about whom available impeachment material was available was not used. I recall the testimony and appearance of Patricia Prem, Black's mother, at trial. Her credibility and the value of her testimony were not great to begin with. *E.g.*, Carpenter Dep. at 42:4-16. Had trial counsel impeached her as Garcia now suggests, his position would not have

improved. Claim 1C is denied.

## Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Claims 1 and 2 meet the COA standard. Garcia's third claim was dismissed on April 26, 2010, as procedurally defaulted. Order Denying Claim 3 (doc. 703). Since then, it has also been rejected on the merits by the Supreme Court. *Abbott v. United States*, ___ U.S. ___, 131 S. Ct. 18, 23 (2010). It does not meet the COA standard.

Accordingly, IT IS HEREBY ORDERED as follows:

1. Garcia's first two claims for relief are DENIED;

2. All claims now having been denied, Garcia's motion to vacate, set aside, or

correct the sentence under 28 U.S.C. § 2255 (doc. 649) is DENIED;

3. A certificate of appealability is GRANTED as to Claims 1 and 2 and DENIED as to Claim 3. The Clerk of Court shall immediately process the appeal if Garcia files a Notice of Appeal;

4. The Clerk of Court shall ensure that all pending motions in this case and in CV 09-103-BLG-RFC are terminated and shall close the civil file by entering judgment in favor of the United States and against Garcia.

DATED this $\cancel{2}\theta$ th day of September, 2011.

Richard F. Cebull, Chief Judge
United States District Court